# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. STEPHEN PHILLIP CASHER, Defendant. | CR 19-65-BLG-SPW<br><br>ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION IN LIMINE REGARDING ROCKY MOUNTAIN BANK'S LENDING PRACTICES |

The Defendant, Stephen Casher, has filed an opposed motion *in limine* to exclude evidence of Rocky Mountain Bank's (RMB) lending practices and expert testimony on banking practices by the Government. (Doc. 45.) The Government filed a response, (Doc. 61), and Casher filed a reply, (Doc. 70). For the following reasons, the Court denies the motion in part and grants it in part.

I.  **Background**

A superseding indictment charges Casher with bank fraud (Counts I-VI), money laundering (Count VII), false entry in bank books (Counts VIII-XIII), and blackmail (Count XIV). (Doc. 27.) The superseding indictment primarily revolves around private loans Casher allegedly made to another individual, Larry Price. It alleges Casher made the private loans to Price while simultaneously

1

approving loans, in Casher's capacity as a loan officer and market president of RMB, to entities controlled by Price and for which Price was a guarantor—all without disclosing the private loans to RMB. (Doc. 27.)

Casher has filed a motion *in limine* asking the Court to prevent the Government from admitting evidence of RMB's lending practices and evidence of banking industry standards through testimony of RMB bank employees. (Doc. 45.)

## II. Discussion

*A. Testimony from RMB employees about the loans and policies at issue, including whether knowledge of the allegedly false statements would have influenced how they evaluated the loan documents, is relevant.*

The federal bank fraud statute punishes one who "knowingly executes, or attempts to execute, a scheme or artifice—to defraud a financial institution." 18 U.S.C. § 1344. To prove Casher knowingly executed a scheme to defraud, the Government must prove Casher misrepresented or concealed a material fact. *Neder v. United States*, 527 U.S. 1, 22 (1999).

"[A] false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." *Id.* at 16. (internal quotation marks and brackets omitted). Materiality is an objective test that looks at "the intrinsic capabilities of the false statement itself, rather than the possibility of the actual attainment of its end."

2

*United States v. Peterson*, 538 F.3d 1064, 1072 (9th Cir. 2008) (quoting *United States v. Facchini*, 832 F.2d 1159, 1162 (9th Cir. 1987)). Critically, the statute does not require the Government to prove the victim bank actually relied on the defendant's false statements or suffered financial harm. *Shaw v. United States*, 137 S. Ct. 462, 467 (2016); *Neder*, 527 U.S. at 24–25; *United States v. Lindsey*, 850 F.3d 1009, 1014 (9th Cir. 2017).

Casher first argues evidence of RMB's lending practices is irrelevant and inadmissible. To support this position, he relies on *United States v. Lindsey*, 850 F.3d 1009 (9th Cir. 2017). In *Lindsey*, the Ninth Circuit held that lender negligence in verifying loan application information, and even intentional disregard of the information, is not a defense to fraud. *Id.* at 1011–12. Because "materiality is an objective element, and an absence of reliance does not affect its presence," the Circuit reasoned that whether the lenders intentionally disregarded the defendant's false statements "has little relevance to whether those statements are intrinsically able to influence a decision." *Id.* at 1015–16. The circuit concluded, "Add the fact that evidence of individual lender behavior can easily touch on lender negligence, intentional disregard, or lack of reliance—none of which is a defense to mortgage fraud—and a bright-line rule against evidence of individual lender behavior to disprove materiality is both a reasonable and necessary protection . . . ."

3

*Id.* at 1017. Therefore, the defendant could not admit evidence of specific prior instances of a lender's bad loans or mistakes. *Id.* at 1019.

Casher argues that although *Lindsey* limits the defense, "the ruling is a gate that swings both ways." (Doc. 46 at 8.) He argues *Lindsey* similarly limits the Government from introducing evidence of RMB's lending practices and whether RMB relied on the alleged misrepresentations. (*Id.*) He reasons RMB's behavior—the behavior of an individual bank—is inadmissible because whether or not RMB did or did not rely on the alleged misrepresentations is not an element of bank fraud or relevant to the materiality inquiry. (*Id.* at 9.)

The Government, in response, argues that although it does not need to prove RMB relied on the false statements, testimony from RMB employees about the importance of the information in RMB's decision-making process is relevant to the issue of materiality. (Doc. 65 at 5.) The Government contends that while evidence of past behavior and prior non-reliance is irrelevant, evidence regarding the decision-making process for the very loans and loan policies at issue is highly probative. (*Id.* at 8.)

The Government is correct. Before even reaching the issue of materiality, the Government must establish that the allegedly false statements were, in fact, false. To do this, the Government must provide the jury context for the statements: for

4

example, RMB's loan approval process, the information it solicits from customers in its loan documents, and how RMB evaluates and uses the information. The Government must then admit the documents containing the allegedly false statements, along with evidence demonstrating how they are false. Moreover, the superseding indictment clearly indicates that not only will the allegedly false statements on Price's personal financial statements be at issue, but so will Casher's role in approving the loans as a loan officer and market president for RMB. (Doc. 27.) Evidence of Casher's role will therefore be relevant to the Government's case at a fundamental level.

The Government must also prove the allegedly false statements were material. To meet this requirement, it might elicit testimony from RMB employees about the importance of the information contained in the loan documents. It may also elicit testimony that RMB did rely on the false statements and likely would not have approved the loans at issue had it known of the misrepresentations. *See United States v. Ovist,* 2012 WL 5830296, at *7 (D. Or. Nov. 16, 2012) ("[T]o decide whether the false statements had a natural tendency to influence, or were capable of influencing, the decisions of the lenders, the jury must know something about the lenders' decision-making process.") (quoting *United States v. Maximov,* 2011 WL 4915162, at *1–2 (D. Ariz. Oct. 17, 2011)).

5

*Lindsey* does not prevent the Government from admitting this evidence. *Lindsey* limits a defendant from admitting evidence of lender behavior to avoid confusing the jury into believing actual reliance on a defendant's false statements is an element of fraud. See *Lindsey*, 850 F.3d at 1018. The Government, however, is free to introduce this evidence when it attempts to demonstrate that the defendant's statements were false and material.[1] While there does not appear to be an appellate opinion directly addressing this issue, at a minimum, the Ninth Circuit has affirmed cases through memorandum opinions where the Government has used lender testimony about the loans and policies at issue to prove a defendant's false statements were material—indicating a standard practice. *E.g., United States v. Wagner*, 739 Fed. Appx. 440, 442 (9th Cir. 2018) ("The district court did not abuse its discretion in allowing the government to present [a banker's] testimony to establish the materiality of Wagner's fraudulent representations."); *United States v. Plany*, 711 Fed. Appx. 392, 394 (9th Cir. 2017) (holding a banker's testimony was sufficient to prove materiality); *United States v. Rivera*, 686 Fed. Appx. 470, 472 (9th Cir. 2017) (holding a FEMA administrator's testimony that the false

---

[1] And conversely, if the Government opens the door by submitting this evidence, the defendant may cross-examine and submit evidence of his own to cast doubt on whether the lenders did rely on the false statements and whether the information was capable of influencing their decision-making. However, the defendant could only submit contrasting evidence for this limited purpose (e.g., he could not then submit evidence of *other* bad loans that the bank approved).

6

representations were capable of influencing her reimbursement decision was sufficient to prove materiality); *United States v Brandt*, 466 Fed. Appx. 610, 611 (9th Cir. 2012) ("Lender representatives also testified that, had they known of the various misstatements, they would not have made the loans at issue . . . Thus there is no question that the evidence sufficiently proved the misstatements were material.").

Casher is unable to provide any cases where a court prevented the Government from admitting evidence of a victim bank's loan process regarding the loans at issue or of actual reliance on a defendant's misrepresentations.[2] Instead, he believes the rule from *Lindsey* is a "gate that swings both ways." (Doc. 46 at 8.) On closer inspection, however, his argument falls apart.

This is primarily because evidence of non-reliance is highly prejudicial to the Government, but evidence of reliance *is not* highly prejudicial to the defense. If a defendant submits evidence of negligent reliance or evidence of other bad loan practices, the evidence is highly prejudicial and misleading because it implies the Government must prove an additional element: actual reliance. The Court would

---

[2] In his reply, Casher does cite two cases he believes support his argument that "anecdotal evidence and subjective beliefs do not support a claim." (Doc. 70 at 3–4.) However, the first case discusses the admissibility of an *expert's* subjective beliefs—something not at issue here. *See U.S. Gypsum Co. v. Lafarge N.A. Inc.*, 670 F. Supp. 2d 748, 753–55 (N.D. Ill. 2009). In the second case, the district court found that a plaintiff's submission of conflicting affidavits containing differing subjective assessments of a Texas community toward homosexuals had little probative value as to whether the case should transfer to the community. *Doe v. City of San Angelo*, 2009 WL 5033936, at *6 (N.D. Tex. Dec. 21, 2009). Both cases are irrelevant to Casher's argument.

most likely find the probative value of the lender's past behavior (if any probative value existed) was substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury. *See Lindsey*, 850 F.3d at 1018 (citing Fed. R. Evid. 403). On the other hand, if the Government introduces evidence of actual reliance, the evidence is not highly prejudicial to the defendant because it does not, for example, reduce the number of elements the Government must prove. Rather, actual reliance can be highly probative of whether the allegedly false statements were material. The jury is then left to decide whether the victim bank's subjective reliance on the false statements indicates the false statements were objectively material. If necessary, the Court could accept a limiting instruction explaining as much. *See* Fed. R. Evid. 105.

Moreover, Casher is free to rebut the Government's evidence by testimony of industry practices. *Lindsey*, 850 F.3d at 1016 ("[D]efendants can disprove materiality through evidence of the lending standards generally applied in the mortgage industry."). Casher may attempt to show RMB acted unreasonably and that a reasonable bank would not have relied on the defendant's false statements—i.e., the misrepresentations were immaterial. Again, the jury would be left to

8

decide, when comparing both parties' evidence, whether the false statements were material.[3]

> B. *The Government may admit testimony from RMB employees as to their knowledge of underwriting guidelines and policies acquired through their employment with RMB.*

Casher next argues the Government should be prohibited from introducing evidence of the objective standards or practices of banks through lay testimony from RMB bank employees. The Government argues it should be able to have RMB employees testify about their knowledge of guidelines and policies gained through their employment with RMB. Both parties are correct.

Fed. R. Evid. 701 limits testimony in the form of an opinion from a lay witness to one that is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not

---

[3] Casher contends a lay witness cannot testify that RMB would not have approved the loans at issue if RMB had known of the allegedly false statements. (Doc. 70 at 3–4.) In doing so, he appears to argue the Government can only prove materiality through expert testimony. However, lay witnesses may offer opinion testimony if the testimony meets the requirements under Fed. R. Evid. 701. With the proper foundation, the Government's witnesses could testify about whether they would have approved the loans at issue had they known the loan documents contained alleged misrepresentations. *See United States v. Kerley*, 784 F.3d 327, 339–40 (6th Cir. 2015) ("[I]t does not take any specialized or technical knowledge to realize that lending institutions would be reluctant to approve a loan application if they knew that it contained false statements about material facts.") (quoting *United States v. Hill*, 643 F.3d 807, 842 (11th Cir. 2011)). Casher is certainly free to cross-examine the Government's witnesses on whether they would not have approved the loans with that knowledge. The jury may then compare the Government's evidence to Casher's (including countervailing industry practices) to determine whether the allegedly false statements were material.

based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Subsection (c), in particular, exists to prevent parties from evading expert witness disclosure requirements by "simply calling an expert witness in the guise of a layperson"—i.e., surprise expert testimony. *See* Fed. R. Evid. 701, Committee Notes on Rules—2000 Amendment. The difficulty, then, is distinguishing between testimony based on a layperson's personal knowledge and testimony based on scientific, technical, or other specialized knowledge.

Luckily, several circuit court opinions provide guidance for lay testimony regarding banking and similar business practices. In *United States v. Kerley*, 784 F.3d 327, 337–38, (6th Cir. 2015), the Sixth Circuit summarized many of them:

> For example, in *United States v. Munoz–Franco*, 487 F.3d 25 (1st Cir. 2007), the First Circuit upheld the admission of testimony by a bank's former vice president of commercial lending about how a loan should have been classified under the bank's loan classification system, even though he did not remember seeing the specific loan classifications at issue during his employment with the bank, because his testimony was based on the knowledge of the bank's practices that he acquired during his employment there. *Id.* at 35–36.
> In *United States v. Valencia*, 600 F.3d 389 (5th Cir.2010), the Fifth Circuit affirmed the admission of testimony under Rule 701 by the former chief risk officer of Dynegy regarding his analysis of Dynegy's various natural gas trading positions and how Dynegy stood to benefit from changes in published price indices. The court found a sufficient foundation for the testimony, even though the witness completed his analysis at the request of the government after he left the company, because his "knowledge and analysis were derived from duties he held at Dynegy." *Id.* at 416.

Likewise, the Second Circuit has held that a witness chosen to conduct an investigation because of specialized knowledge she possesses may testify about perceptions she formed during the investigation, consisting of "investigatory findings and conclusions," within the scope of Rule 701(a). *Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 181 (2d Cir.2013). The Second Circuit followed Bank of China in allowing a witness to testify about what Adelphia Communications Company's related-party-receivables balance would have been absent certain debt reclassifications, based on the witness's employment with the company, during which he was responsible for reviewing its accounting records and correcting its financial statements. *See United States v. Rigas*, 490 F.3d 208, 222–24 (2d Cir.2007); *see also Burlington N. R.R. Co. v. Nebraska*, 802 F.2d 994, 1004–05 (8th Cir.1986) ("Personal knowledge or perception acquired through review of records prepared in the ordinary course of business, or perceptions based on industry experience, is a sufficient foundation for lay opinion testimony.").

In *Kerley*, the Sixth Circuit analyzed lay testimony about banking practices. A jury convicted two defendants of numerous financial crimes, including bank and wire fraud. *Id.* at 332–34. At trial, the district court permitted the Government to call two lay witnesses, each employed at a different victim bank, to testify about the materiality of the misrepresentations at issue to their respective employers' loan approval decisions. *Id.* at 335. After their convictions, the defendants appealed, arguing the witnesses' testimony ran afoul of Fed. R. Evid. 701(c) because it was expert in nature. *Id.* at 339. The circuit court affirmed the convictions and concurred with other circuits that lay opinion testimony based on a variety of topics was permissible "when the witness gained such knowledge through employment or

11

involvement in the day-to-day affairs of the business in question." *Id.* The court continued,

> Moreover, we concur with the Eleventh Circuit's view that "it does not take any specialized or technical knowledge to realize that lending institutions would be reluctant to approve a loan application if they knew that it contained false statements about material facts." [*United States v. Hill*, 643 F.3d 807, 842 (11th Cir. 2011)]; *see also United States v. Cuti*, 720 F.3d 453, 460 (2d Cir. 2013) ("When the issue for the fact-finder's determination is reduced to impact—whether a witness would have acted differently if he had been aware of additional information—the witness so testifying is engaged in a process of reasoning familiar in everyday life." (internal quotation marks omitted)).

*Id.* at 339–40.

Finally, the Court noted its ruling was not without limitations. In an earlier opinion, *United States v. White*, 492 F.3d 380, 403–04 (6th Cir.2007), the 6th Circuit reversed a district court's decision to permit witnesses to testify in general about Medicare's structure and procedures without qualifying as expert witnesses because the topic was beyond the knowledge of the average lay person. However, when applying *White* to the issues at hand in *Kerley*, the court found the witnesses had limited their testimony specifically to their employers' respective underwriting polices and lending programs—knowledge they gained through their employment. *Kerley*, 784 F.3d at 340. The witnesses did not, for example, "purport to opine about generally applicable standards in the mortgage lending industry—testimony

12

about a subject, like the Medicare testimony in *White*, that would be familiar only to one with specialized or technical knowledge under Rule 702." *Id.* Therefore, the testimony was admissible, even under *White*.

*Kerley* is persuasive authority, and the Court will use its framework to evaluate testimony from RMB employees. The Government may call RMB employees to testify about RMB's specific underwriting policies and lending programs so long as their testimony is based on knowledge they gained through their employment or involvement in RMB's day-to-day operations. *See id.* at 339–40. However, the Court will prevent RMB employees who are not qualified as experts from testifying generally about banking industry standards and practices. *See id.* at 340 (citing *White*, 492 F.3d at 403–04). Casher is correct that the latter type of testimony would be inadmissible under Fed. R. Evid. 701(c).[4] Accordingly,

**IT IS HEREBY ORDERED**:

The Defendant's Motions in Limine to exclude evidence of (A) RMB's banking practices; and (B) expert testimony on banking practices by the Government (Doc. 45) is **GRANTED IN PART** and **DENIED IN PART**, as follows:

---

[4] If either party's witness is intended to serve dual roles as both an expert and a lay witness, it is not categorically prohibited. *See U.S. v. Freeman*, 498 F.3d 893, 904 (9th Cir. 2007). However, the party calling the witness should carefully differentiate between the types of testimony while the witness testifies, preferably by providing a clear break between the lay and expert testimony. The party should also provide the Court with an instruction to explain the witness's dual roles to the jury.

1. Evidence of RMB's banking practices, including whether knowledge of the allegedly false statements would have influenced how RMB evaluated the loan documents at issue, is relevant.
2. Testimony from RMB employees as to their knowledge of underwriting guidelines and policies acquired through their employment with RMB is admissible under Fed. R. Evid. 701.
3. The Government may not admit testimony from RMB employees about general banking industry standards and practices.
4. The Clerk of Court shall notify the parties of this Order.

DATED this 20th day of May, 2020.

*Susan P. Watters*
SUSAN P. WATTERS
United States District Judge