IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| UNITED STATES OF AMERICA, | CR 19-65-BLG-SPW |
|---|---|
| Plaintiff, | |
| vs. | ORDER DENYING MOTION TO SUPPRESS STATEMENT OF STEPHEN CASHER GIVEN TO FBI SPECIAL AGENT JOHN TEELING |
| STEPHEN PHILLIP CASHER, | |
| Defendant. | |

The Defendant, Stephen Casher, filed an opposed motion to suppress the statements he gave to FBI Special Agent John Teeling during an interview. (Doc. 48.) The Government filed a response. (Doc. 64.) For the following reasons, the Court denies the motion.

I. **Background**

A superseding indictment charges Casher with bank fraud (Counts I-VI), money laundering (Count VII), false entry in bank books (Counts VIII-XIII), and blackmail (Count XIV). (Doc. 27.) The superseding indictment primarily revolves around private loans Casher allegedly made to another individual, Larry

1

Price. It alleges Casher made the private loans to Price while simultaneously approving loans, in Casher's capacity as a loan officer and market president of Rocky Mountain Bank, to entities controlled by Price and for which Price was a guarantor—all without disclosing the private loans to Rocky Mountain Bank. (Doc. 27.)

Before filing the indictment against Casher, the Government prosecuted Larry Price for wire fraud and conspiracy to commit money laundering. *United States v. Larry Wayne Price Jr.*, CR 18-85-BLG-DLC, *Superseding Information (Doc. 43)* (December 13, 2018). Price pleaded guilty to the charges. *Id.*, *Minute Entry (Doc. 47)* (December 18, 2018). Two entities Price defrauded were Ninety M, LLC ("Ninety M"), and Three Blind Mice, LLC ("TBM"). *Id.*, *Superseding Information (Doc. 43)* (December 13, 2018). Casher was a member of both entities. (Doc. 64 at 2; 64-3 at 37–38). The Government states that during the investigation into Price in April and May 2018, the FBI interviewed Casher about Price and his dealings with TBM and Ninety M. (Doc. 64 at 2.)

While the investigation was in its early stages, on April 30, 2018, Attorney Randy Nelson informed Special Agent John Teeling and the U.S. Attorney's Office for the District of Montana that he represented TBM and inquired whether TBM "or its members" were "a target or subject of investigation." (Doc. 64-1.) Special

Agent Teeling replied that TBM and its members were "viewed as victims." (*Id.*) On May 17, 2018, Nelson responded: "[W]e would like you to know that we do not view TBM as a victim. Rather, we view the situation as in the process of a debt repayment and asset liquidation workout agreement, in which Mr. Price is acting in the utmost good faith." (Doc. 64-2 at 1.) Nelson stated members of TBM would testify favorably for Price and continued, "We hope that you can respect our position. These debts are being honestly and fairly worked out between the parties, through their attorneys." (*Id.*)

Around this same time, Nelson emailed Price about his "indebtedness" to TBM. (Doc. 64-5 at 1.) Nelson discussed how his clients and Price shared a common interest in selling and liquidating some of Price's Montana properties and assets to ensure Nelson's clients were "made whole." (*Id.*) In July 2018, Nelson also engaged in similar discussions with the civil section of the Department of Justice. (Doc. 64-6.)

On May 2, 2019, Special Agent Teeling interviewed Casher (the "Teeling interview") about certain loans Casher approved for Price from Rocky Mountain Bank—different loans than those Price received from entities like TBM and Ninety M. (Doc. 64-3 at 1) ("So it's going to be about these loans that [Price] got from the bank."). Because Casher had approved the loans in his capacity as a loan

3

officer and market president at Rocky Mountain Bank, Special Agent Teeling asked Casher detailed questions about Rocky Mountain Bank's loan approval process for an individual like Price. (*Id.* at 4–8.) He then informed Casher the question he had "been tasked with asking" was whether Price's private loans (i.e., those he received from Casher's entities) should have been included in Price's loan documents with the bank. (*Id.* at 13–14); *see* (*id.* at 13–31) (discussing private loans Casher's entities made to Price). Bank employees had earlier informed Special Agent Teeling that they were not aware of Price's private loans. (*Id.* at 16–17.) Therefore, he asked, "Should these private loans have been on there?" (*Id.* at 14.)

Special Agent Teeling also asked several questions about Casher's sale of his residence to Price. (*Id.* at 32–40.) Price purchased the residence at above market value and had since claimed Casher sold him the house as a condition of getting a loan approved through Rocky Mountain Bank. (*Id.* at 34.) Special Agent Teeling wanted to know whether that was true. (*Id.* at 36–37.)

Later in the interview, Casher mentioned "our attorney," Nelson, and how he had instructed Nelson to file a motion in Virginia in ongoing litigation against Price. (*Id.* at 39.) He stated he and Nelson worked to obtain quitclaim deeds from Price

4

for several of Price's properties after they learned Price had defrauded some of Casher's entities. (*Id.* at 44.)

A few days after the Teeling interview, Attorney Mark Parker informed the U.S. Attorney's Office for the District of Montana that he and Nelson would be representing Casher "on all matters involving the Department of Justice." (Doc. 64-4.) On May 16, 2019, the government filed an indictment, initiating the instant case. (Doc. 1.) Casher has since filed a motion to suppress the Teeling interview. (Doc. 48.)

## II. Discussion

The parties agree that federal prosecutors in Montana are bound by the Montana Rules of Professional Conduct. (Doc. 49 at 3; Doc. 64 at 6–10); *see* 28 U.S.C. § 503B(a) (stating federal attorneys are bound by local rules); *United States v. Koerber*, 966 F.Supp.2d 1207, 1226 (D. Utah, 2013). Montana Rule of Professional Conduct 4.2 provides:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

Casher argues the Government knew Randy Nelson represented him when Special Agent Teeling interviewed him in May 2019. He argues the Teeling

5

interview violated Rule 4.2 and, therefore, the Court should suppress statements Casher made during it. (Doc. 49 at 4.)

The Government argues Casher was not represented "in the matter" that was the central topic of the Teeling interview: whether the private loans Casher made to Price should have been disclosed to Rocky Mountain Bank. Instead, the Government contends, Nelson only represented Casher in Casher's capacity as a member of TBM and was attempting to help Casher recover assets from Price through civil litigation. (Doc. 64 at 6–10.) Furthermore, the Government argues the Teeling interview was otherwise authorized by law. (*Id.* at 10–14.) The Government is correct.

> a. *The Government did not have knowledge Randy Nelson represented Casher in the criminal matter.*

Montana's Rule 4.2 is modeled after the American Bar Association's Model Rule 4.2. *Compare* Mont. R. Prof. Conduct 4.2 *with* Mod. R. Prof. Conduct 4.2. Therefore, comments and authority on ABA Rule 4.2 are persuasive in interpreting and applying Montana's rule.

Of concern here are Comments 4 and 8. Comment 4 states: "This Rule does not prohibit communication with a represented person . . . concerning matters outside the representation." Mod. R. Prof. Conduct 4.2, Comment 4. Comment 8 then states:

6

> The prohibition on communications with a represented person only applies in circumstances where the lawyer knows that the person is in fact represented in the matter to be discussed. This means that the lawyer has actual knowledge of the fact of the representation; but such actual knowledge may be inferred from the circumstances. *See* Rule 1.0(f). Thus, the lawyer cannot evade the requirement of obtaining the consent of counsel by closing eyes to the obvious.

Mod. R. Prof. Conduct 4.2, Comment 8.

The Court finds that TBM's civil recovery of assets from Price and whether Casher should have disclosed his private loans with Price to Rocky Mountain Bank are distinct matters. When Nelson first contacted Special Agent Teeling over a year before the Teeling interview, Nelson stated he represented TBM, which included Casher in his capacity as a member. He wrote that he "view[ed] the situation as in the process of a debt repayment and asset liquidation workout agreement, in which Mr. Price [was] acting in the utmost good faith." (Doc. 64-2 at 1.) Nelson also spoke directly with Price on behalf of TBM and Casher with the goal of selling and liquidating some of Price's Montana properties and assets. (Doc. 64-5.) When Casher later mentioned Nelson to Special Agent Teeling during the Teeling interview, he described Nelson as "our attorney," and Casher spoke about quitclaim deeds he and Nelson had been working to obtain from Price, indicating Nelson represented Casher and other members of TBM in that capacity. (Doc. 64-3 at 39, 44.)

7

Special Agent Teeling, however, interviewed Casher about his role as a loan officer with Rocky Mountain Bank and asked specific questions about why his private loans to Price had not been disclosed on Price's loan documents with the bank. Several times, Special Agent Teeling described these questions as the primary purpose for his interview with Casher.[1] (Doc. 64-3 at 1, 4–8, 13–14.) He also asked about the sale of Casher's residence and whether the sale was part of a quid pro quo for Price to receive a loan from Rocky Mountain Bank. (*Id.* at 32–40.) The criminal investigation of these issues and the civil recovery of TBM's assets from Price are two distinct matters.

Moreover, the documents the Government supplied indicate it did not have actual knowledge that Nelson represented Casher in the criminal matter. *See* Mod. R. Prof. Conduct 4.2, Comment 8. Once again, Nelson contacted Special Agent Teeling to inform him that Nelson represented TBM and its members. (Doc. 64-1.) After learning TBM and its members were "viewed as victims," Nelson stated his clients would not want to participate in the criminal investigation of Price "in a

---

[1] Special Agent Teeling did ask Casher about some "housekeeping things," which included background information and a timeline for Casher's discovery that Price had been misusing the funds TBM loaned him. (Doc. 64-3 at 40–47.) These questions, however, did not concern "the subject of the representation" of the Assistant United States Attorneys for the Government. *See* Mont. R. Prof. Conduct 4.2. The subject of their representation was the criminal investigation into whether Casher should have disclosed his private loans with Price to Rocky Mountain Bank.

victim position," and they viewed the situation "as in the process of a debt repayment and asset liquidation workout agreement." (Doc. 64-1; Doc. 64-2.)

The Government only knew Nelson represented Casher in that civil matter. From the Government's perspective, the Teeling interview therefore dealt with "matters outside" Nelson's representation. *See* Mod. R. Prof. Conduct 4.2, Comment 4. Only a few days later did the Government learn Nelson would also represent Casher in the criminal matter. *See* (Doc. 64-4) (an email from Mark Parker stating, "Stephen Casher came into see me for guidance this morning. Randy Nelson and I *will be representing him* on all matters involving the Department of Justice." (emphasis added)).

The Court finds the communications between Nelson, Casher, and Special Agent Teeling did not give the Government knowledge that Nelson represented Casher in the Government's criminal investigation of whether the private loans Price received should have been disclosed to Rocky Mountain Bank. Nor did the Government, during the Teeling interview, "evade the requirement of obtaining the consent of counsel by closing eyes to the obvious." *See* Mod. R. Prof. Conduct 4.2, Comment 8. The "debt repayment and asset liquidation workout agreement," *see* (Doc. 64-2 at 1), and the criminal investigation into whether Price's loans should have been disclosed to the bank were separate matters. *See* Mod. R. Prof. Conduct

9

4.2, Comment 4. Accordingly, the Government did not violate Montana Rule of Professional Conduct 4.2 when Special Agent Teeling interviewed Casher.

> b. *Communicating with Casher as part of the Government's preliminary investigation was otherwise authorized by law.*

Even so, the Government was authorized to communicate with Casher during its preliminary investigation by law. "Communications authorized by law may . . . include investigative activities of lawyers representing governmental entities directly or through investigative agents, prior to the commencement of criminal or civil enforcement proceedings." Mod. R. Prof. Conduct 4.2, Comment 5.

When the Government has yet to initiate formal proceedings, the Ninth Circuit has held that communication with a represented suspect as part of a noncustodial investigation may not violate Rule 4.2, although the circuit has "declined to announce a categorical rule excusing all such communications from ethical inquiry." *United States v. Talao*, 222 F.3d 1133, 1139 (9th Cir. 2000). Instead, courts should evaluate these communications through "'case-by-case adjudication,' policing clear misconduct while keeping in mind that prosecutors are 'authorized by law' to employ legitimate investigative techniques in conducting or supervising criminal investigations." *Id.* (quoting *United States v. Hammad*, 858 F.2d 834 (2d Cir.

1988)).  Part of this analysis hinges on whether the Government and suspect have "clearly taken adversarial positions."  *Id.*

The Court finds the Government did not engage in clear misconduct and employed legitimate investigative techniques when Special Agent Teeling interviewed Casher.  The Teeling interview was a pre-indictment, noncustodial interview, as Casher himself admits.  (Doc. 49 at 2.)  A review of the interview transcript indicates the interview was neither combative nor adversarial; rather, it was investigative in nature, and Special Agent Teeling thanked Casher several times for his cooperation.  *See generally* (Doc. 64-3).  Furthermore, while Special Agent Teeling and Casher had prior communications leading up to the interview, *see* (*id.* at 40–47), there was no implication that the two had discussed criminal liability before.  Before the Teeling interview, the communications between Casher and the Government dealt with Price: namely, Price's fraud against Casher's entities.  *See* (Doc. 64 at 2; Doc. 64-1; Doc. 64-2; Doc. 64-3 at 40–47; Doc. 64-6).  The Government and Casher had not yet taken "clearly adversarial positions," and the circumstances do not indicate a clear violation of Rule 4.2.  *See Talao*, 222 F.3d at 1139.  Accordingly, as part of the Government's pre-indictment investigation, the Teeling interview was a communication authorized by law, and the Court denies Casher's motion to suppress it.

11

## III. Conclusion

The Government did not have knowledge Randy Nelson represented Casher in the criminal investigation of whether Casher's private loans to Price should have been disclosed to Rocky Mountain Bank. Furthermore, communicating with Casher as part of the Government's preliminary investigation was otherwise authorized by law. The Government did not violate Montana Rule of Professional Conduct 4.2 when Special Agent Teeling interviewed Casher. Accordingly,

**IT IS HEREBY ORDERED** that the Defendant Stephen Casher's Motion to Suppress Statement of Stephen Casher Given to John Teeling (Doc. 48) is **DENIED**. The Clerk of Court shall notify the parties of this Order.

DATED this 21st day of May, 2020.

/s/ Susan P. Watters
SUSAN P. WATTERS
United States District Judge